Brinkerhoff, J.
1, Is Lawrence, by reason of negligence in the conduct of his agency, liable to his principals, Grant & Stone, for the losses accruing to them by reason of such negligence ? And if so,
2. Does the mortgage given by Clarkson to Lawrence to indemnify him against such liability, and assigned by him to Grant & Stone, inure to their benefit in preference to the claims of a subsequent mortgagee ? These are the questions in the case.
Lawrence, being an agent acting without compensation, *10 is liable only for gross negligence. To define what constitutes “ gross negligence ” so as to render the phrase more intelligible or exact, is difficult if not impossible; and all attempts to do so, have, it would seem, heretofore failed. We are disposed to regard it as a question of fact, to be determined by reference to all the circumstances of the case, including the subject matter and objects of the agency, and the known character, qualifications, and relations of the parties. Wliat would be but slight negligence in the treatment of a matter of trifling importance, might perhaps be gross negligence in dealing with concerns of momentous interest. And a stupid and ignorant man, while devoting all his powers to the duties of his agency, might be guilty of blunders of omission or commission which, in one of higher qualifications, would be strong or conclusive evidence of culpable delinquency.
What, then, was the duty which Lawrence, as agent, was called on, and, by his acceptance of the agency, required to discharge ? What specific thing was he to do ? To ascertain the proper answer to these questions, we must refer to those parts of the correspondence between Grant & Stone and Clarkson, which,'after the close of the negotiations, verbal and written, between them, purport to and do embody the final stipulations of the parties, and which were submitted to Lawrence for his acceptance as the basis of his agency. This correspondence, thus submitted to Lawrence, served the purpose of a letter of attorney from Grant & Stone to him, and embraced the delegations and limitations of his authority, and a specification of his duty. Let us turn now to the correspondence.
Clarkson goes on from Cincinnati to Philadelphia, bearing a strong letter of recommendation from Lawrence to Grant & Stone; and, after his arrival, the presentation of Lawrence’s recommendation, and some verbal negotiation, the following letter, for the purpose of fixing definitely what had then been agreed on between them, passes from Grant & Stone to Clarkson:
*11 Grant & Stone to Clarkson, Philadelphia, September 13th, 1838. After referring to morning’s conversation, say:
“ We can dispose of a great deal of bacon; and if you make us your sole agents, and allow us to use our neighboring markets, you cannot send us too much. We usually advance two-thirds to three-fourths the value of an article on its arrival hero, and, except in particular cases, where we have agreed to advance on bills of lading, with orders to insure, seldom deviate : and when we do advance, claim the right to guarantee sales at our usual charge. Should decline your proposition — it being out of our usual course — but for our mutual friend Lawrence’s strong introduction, and your proposition to secure us on real estate; for though, as commercial men, we do not like real estate, particularly at a distance, yet in your case, as it is only intended as collateral and temporary security, we shall accede to it, and endeavor to meet your wishes, and, therefore, propose to advance you $25,000, by accepting your four and six months drafts, based on consignments of at least 500,000 lbs. of bacon, to be sold on your account next spring; and should you not consign so much, our commission to be charged as if the whole had been consigned; provided you draw for the whole $25,000, or otherwise in that proportion. When the acceptances fall due, if you wish your property held, or we are not in funds from sales, you are to draw again, and you to meet the drafts falling due. By this plan we advance you five cents a pound on your bacon, and when we pay the carriage and charges here, we think it will be all you can wish. Our charges will be, the expenses and four per cent, commission, and guaranty on all sales.”
If the negotiation had ended with this letter, it might, perhaps, be fairly inferred that the security required of Clarkson was limited, so as to secure nothing more than the transmission by Clarkson, to Grant & Stone, of the stipulated quantity of bacon. But the treaty did not stop here. It was renewed in conversation the same evening, as is evident from the first clause of the following letter, of the next day’s date :
Grant & Stone to Clarkson, September 14th, 1838. After referring to last evening’s conversation, say:
“ Our understanding is, you are to make us your agents for the sale of provisions the coming year. Minimum of sales to be 500,000 lbs. bacon. We to advance you in cash $10,000 to $12,000; in our acceptances of your drafts, at four to six months, $20,000 to $25,000. The acceptances to be renewed, if necessary; but no more to be in cash advances beyond the amount stated, and the expenses of transportation. You to furnish us with certain security, or the guaranty of Lawrence, for our advances, commissions, and interest; so that, in case of accident to you, or incapacity in any way to fulfill your engagement, it *12 shall be carried through by him, without any loss to us. The provisions, beyond the 500,000 lbs., to be sold here, or otherwise disposed of for your interest. We to guarantee our sales, and charge you on sales four per cent, commission, and one per cent, on the largest amount we may be in advance to you, in cash or acceptances, at any one time. This last charge, because of the peculiarity of this transaction. For commissions on provisions sent to other places, would not one per cent, be right ?”
Here are further and different stipulations. In the letter of the 13th, the security is spoken of as “ collateral and temporary; ” but in this of the 14th, there is demanded “ certain security, or the guaranty of Lawrence, for our advances, commissions, and interest; so that, in case of accident to you, or incapacity in any way to fulfill your engagement, it shall be carried through by him, without any loss to us:” a plain and, we think, unequivocal requirement for certain and ultimate security.
And this change, from the stipulations embraced in the letter of the 13th to those embodied in that of the 14th, was evidently no mere matter of caprice or inadvertence. There was abundant reason for the change. Eor, while the letter of the 13th proposed only to accept for Clarkson to the amount of $25,000, that of the 14th proposed a cash advance of $10,000 or $12,000, in addition to the acceptances agreed to in the letter of the 13th, while the amount to be shipped remained the same.
It is now, however, insisted, in the face of this understanding, so distinctly and expressly stated, that Grant & Stone were not to have any security whatever, or any guaranty whatever from Lawrence, for their advances, commissions, and interest, but simply a guaranty or security that at least 500,000 lbs. of bacon should be shipped; leaving Grant & Stone to sustain all losses upon their advances, commissions, and interest, if the pork shipped was insufficient to reimburse them, and Clarkson should not be able to pay them. The language of this letter of September 14th, repels any such construction of its terms. The guaranty or security was for advances, commissions, and interest, and not for the shipment merely; so Grant & *13 Stone were, by tbe guaranty or security, to be indemnified against “ any loss ” growing out of either any accident which might happen to Clarkson, or any incapacity “ in any way” to fulfill his engagement.
If the guaranty or security had been for the shipment of the pork merely, nothing would or could have been said about a guaranty or security for the advances, commissions, and interest. The terms expressly relate to the ultimate result of the adventure, and it seems to us that it would be an utter perversion of the language of parties, to hold that the guaranty or security spoken of, was only for the shipment of the minimum quantity of 500,000 lbs., or any other quantity.
That the letter of the 13th, from its reference to a temporary arrangement and the limited amount of the advances to be made on 500,000 lbs. of pork, indicates that the security in that letter mentioned had reference only to the shipment, is very probable, and may be fully conceded. But admitting this to be so, the letter of the 14th was written for the express purpose, as appears upon the face of it, to change and control the terms of the letter of the 13th, and to introduce new stipulations; and in respect of security or guaranty, and what should be its extent and effect, for what the security or guaranty should be given, and what it should cover, all are so distinctly and specifically stated, that the majority of the court have not the slightest hesitation in saying, that Grant & Stone were to be indemnified for their advances, commissions, and interest. That the letter of the 14th, and not the letter of the 13th, was regarded by the parties as embodying the main features of their contract, is further indicated by the next letter which passed between them, and which points to a still further advance to be subsequently made by Grant & Stone.
Grant & Stone to Clarkson, September 19th, 1838:
“ On the basis of ours of the 1 ith, and our further conversation with you, we add our present understanding. We agree, on your making the point of security *14 entirely satisfactory to Lawrence, that we are to accept and retain your drafts ou us at six months for $30,000 ; for which, less discount, you are to draw on us at sight, and on this wo are to charge you one per cent., in addition to the charge proposed in ours of the 14th instant. We are not to be in cash advances for you for any portion of this $30,000, unless perfectly agreeable to us. As you will want no further accommodation now, the particular arrangement for a few thousand dollars more, at six months, can be made hereafter. Interest on the present advance of $30,000 to commence on the 20th instant. Shall expect to hear from you and Lawrence immediately on your arrival at Cincinnati, and doubt not all will be right.”
Thus stood the correspondence when Clarkson left Philadelphia, returned to Cincinnati, and exhibited the correspondence to Lawrence, who, on the 28th, writes, to Grant & Stone as follows.
Lawrence to Grant & Stone, September 28th, 1838 :
“ Have just seen Clarlcson, and he will, to-day, give me ample security, on your account, to cover any liabilities you have engaged to come under for him.
“ He will probably value on you to-day for $10,000, and if so, it will be all right.”
To which they reply, October 3d, 1838 :
“ Clarkson’s $10,000 draft appeared, and was paid at sight, agreeable to your letter of 28th ultimo.”
Next, on the 15th of October, Lawrence and Clarkson again both write to Grant & Stone, as follows.
Lawrence to Grant & Stone, October 15th, 1838 :
“ Clarkson says he will have occasion to draw on you in November for about $30,000, at five or six months time. He has given me what I consider ample security on your account for that sum, and also authorized me, in case of accident or death, to take possession of all the pork, bacon, or lard that may have been put up, to protect all the bills he may have made on account of his pork operations, or other liabilities you may have come under on his account.”
Clarkson to Grant & Stone, October 15th, 1838:
“ I shall succeed in getting 5000 head of hogs at low prices — about $4.25 ; and about 5000 more at $5.50. Hope to put up 15,000 head in the season. Think before the season is half through the price will reach $7.00, and perhaps more; though I hope to got all I want for less. As my payments will be large in November, I must beg authority to draw, at six months, for $20,000 to $30,000 more. I do not ask this without the statement of our friend Lawrence accompanying it, that you may give this authority without any risk. I shall place at once in his hands $30,000 security, in addition to the former. My bacon business will be large, and confined entirely to your house ; therefore, I hope, you will have no hesitation to afford the aid. Drafts on the East is the *15 only way our banks will furnish us any facilities. Let me hear from you as soon as you can, as I must raise considerable money in November, in addition to the amount arranged for whilst in Philadelphia and N. Y.”
Here we find Clarkson asking a further advance, in the way of acceptances on his account, and Lawrence assuring his principals that he had given him what he considered ample security qn their account for thirty thousand dollars. And to these communications Grant & Stone thus reply.
Grant & Stone to Clarkson, October 22d, 1838 :
“ Yours of 15th instant, received. We have this day paid your draft for $13,000, on account of advances on bacon. We notice your request to draw for $20,000 to $30,000. You have permission to draw for $20,000, at six months.”
Grant & Stone to Lawrence, October 23d, 1838:
“ Yours of 15th, received. We have a very favorable impression as to Mr. Clarkson, as you may suppose, when you know we raised him near $30,000 cash, and now give him permission to draw for $20,000 more, making about $50,000, which we consider under your guardianship. Such amounts should, of course, be well guarded when running on a single risk of life ; and although wo hope to shake hands with Mr. Clarkson some ten or twenty years hence; yet we think the arrangement you have made very proper, and are glad you did so.”
Here Grant & Stone, while manifesting their prompt compliance with the wishes of Clarkson and their mutual friend Lawrence, take occasion to remind him of the enormous sum they are placing at. hazard on the faith of his assurances, and, doubtless, with a view to remind him of his responsibility, and to stimulate him to the exercise of vigilance, inform him that they consider the same “ under his guardianship.”
Now let us notice in what manner Lawrence had, thus far, discharged the trust committed to him. Eor, in his correspondence with his principals, he‘gives them ample general assurances, but enters into no details. Up to this time, and afterward, when the advances of Grant & Stone to Clarkson, including advances for freight and the like, amounted to not less than fifty-nine thousand dollars, Lawrence had in fact taken no security except such as might be afforded by the following instrument of writing:
“For $30,000, advanced to me, on the 20th Sept., 1838, by Grant & Stone, I hereby mortgage to them my Clifton Farm, 3 miles north of Cincinnati, eon *16 taining about 530 acres. The above sum was advanced to me for the purpose of purchasing pork; and to secure Grant & Stone, I hereby mortgage the above farm to them, to hold as security, until the conditions of our agreement be fulfilled, as follows: I to make them my exclusive agents for the sale of bacon I may ship east the coming season; not to send less than 500,000 lbs., but probably over 1,000,000 lbs. When the above conditions are complied with, this obligation to be void; but until complied with on my part, the property to be held sacred for their benefit. It is understood-that this property, worth at least $60,000, shall be held sacred for any further advances or authority to value on them given the present season, and in the event of my death this season, Lawrence, the friend of both parties, shall take possession of so much of the bulk pork or bacon as may be sufficient to secure Grant & Stone, for advances made to me in money, or acceptances of my drafts. Should additional security at any time be asked, I pledge myself to give it. Cincinnati, this — —'day of-1838.
“Chas. S. Clarkson.’’
This “ Clifton Farm,” had a proper mortgage on it been taken and retained, would have afforded ample security. It will be observed, however, that it is conditioned, not for the security of Grant & Stone for their “ advances, commissions, and interest,” as stipulated in their letter of the fourteenth of September, but merely for the shipment of the minimum quantity of bacon, as mentioned in the letter of the thirteenth; a time when they did not contemplate advances to half the amount of those which were afterward made.
Moreover, this writing was neither sealed, witnessed, acknowledged, nor recorded. It was not a legal, but, at most, a mere equitable mortgage; good as between the parties to it, while Clarkson chose to leave it so, but liable to be defeated by him at any moment, under the laws of Ohio, by the execution of a more formal instrument in favor of other creditors.
Lawrence and Clarkson were friends, associates and co-directors of the Lafayette Bank. Lawrence knew the necessities of Clarkson and the hazards of his business. He knew that Clarkson was indebted to that bank in about $60,000, and that, by a resolution of the board of directors, additional security was required; and yet, when in the spring of 1839, Clarkson applied to him to give up the aforementioned equitable mortgage, on the ground *17 that he had then shipped to Grant & Stone the stipulated quantity of bacon, and in order that he might mortgage the “ Clifton Farm” for the security of his debt to the bank, Lawrence yielded to his request, gave up the equitable mortgage, and, as president of the bank, and one of a committee appointed for that purpose, took from Clarkson a good legal mortgage on the “ Clifton Farm,” and had the same at once placed on record; and all this without consultation with his principals. It is difficult, very difficult, to resist the conviction that the official position of Lawrence, as president of the bank, had something to do with his strange conduct in this particular', as the agent of Grant & Stone; but under the united assurances of counsel on all sides, that he was a man of high and unsuspected honor and integrity, and the candor and manliness displayed in his answer and testimony herein, we do resist it, and proceed as if no such disparaging suspicion had been momentarily forced on our attention.
Here then we have this agent taking a security defective and mistaken in its condition; defective in its form and execution; liable to be defeated at any moment; and, at last, giving up even this, on the mere word of a man on who.se word and sole ability he knew his principals were unwilling to rely; and thus leaving those principals without a shred of security for the fifty-nine thousand dollars “ entrusted to his guardianship.” This series of marvelous blunders, perpetrated by an old merchant, a bank president, a man sagacious, intelligent, and acquainted with business, we cannot but regard as proof sufficient and satisfactory of gross negligence.
It was not until the fall of 1839 that Grant & Stone learned, from Lawrence or otherwise, that the equitable mortgage on the “ Clifton Farm” had been surrendered, and that they were without security in the hands of Lawrence. When thus informed, they, in courteous and friendly but very decided terms,, announced to Lawrence their disapproval of that surrender, reminded him of his *18 previous positive assurances, and clearly intimated to him their intention to hold him to his responsibility. Thereupon Lawrence endeavored to obtain other security, and took in favor of Grant & Stone a mortgage from Clarkson on his pork house and “Graham Country Seat.” Clarkson represented to Lawrence that there were no incumbrances on the pork house except a mortgage in favor of one Boyd & Co., to the amount of about eight thousand dollars. In this, instead of examining the county records, as he ought to have done, Lawrence contented himself with the representations of Clarkson and was deceived; for there were other mortgages which brought up the amount of •prior incumbrances to twenty thousand dollars, and which subsequently absorbed the whole proceeds of that property and left a balance still unpaid.
When Grant & Stone came to be informed by Lawrence that he had taken these last named securities, they reply that they are “ not able to judge of the securities Clarkson has given” him, express their dislike of second mortgages, and leave him to his responsibility as before. They throughout carefully avoid any acceptance of the latter securities in lieu of the former, and any act or word from which a waiver of his liability for former negligence can be reasonably inferred. Lawrence now,- becoming apprehensive that he had rendered himself liable, or, to use his own words,. “ committed himself,” to Grant & Stone, applies to Clarkson for still further security. Clark-son declines to give further direct security to Grant & Stone, but consents to and does give to Lawrence a mortgage on the “Western Row property,” to indemnify him against his liability to Grant & Stone for negligence in the conduct of his agency. This mortgage was legally executed and recorded.
In this condition things remained until October, 1840, when Mr. Grant, of the firm of Grant & Stone, came to Cincinnati, and a tripartite adjustment was made between the parties. Clarkson was found to be indebted to *19 Grant & Stone to the amount of twenty-five thousand dollars, for which he gave- his note payable in three years; and Lawrence assigned to Grant & Stone the mortgage on the pork house and Graham Country Seat, and also his mortgage of indemnity; all three of the parties assenting to the arrangement.
It is now contended by the Lafayette Bank and the administrator of Ludlow, who claim under a mortgage on the Western Row property subsequent to the mortgagé of indemnity, that this tripartite arrangement between Grant, Clarkson, and Lawrence, was in itself a ratification and adoption by Grant & Stone of the prior acts of Lawrence, and 1¿hat, therefore, .if Lawrence had previously made himself liable for negligence, he was thereby discharged. We cannot think so. Such could not have been the thought or intention of the parties. In the first place, the assignment by Lawrence to Grant & Stone of his mortgage of indemnity against the consequences of his own negligence, and the acceptance of such assignment by Grant & Stone would, it seems to us, be an utterly senseless proceeding, if it were thereby intended to adopt and ratify and confirm the very acts of negligence by virtue of which alone that liability subsisted. That assignment was destitute of all meaning, unless it proceeded on the supposition or tacit admission of a subsisting and continuous liability on the part of Lawrence. In the next place, Lawrence expressly admits that the assignment of the mortgage of indemnity was made and received under the belief, on all hands, that it would be a good and available security in the hands of Grant & Stone. Now, if it be admitted, for the sake of the argument, that this arrangement was such as to amount to a ratification or adoption by Grant & Stone of the prior negligent acts of their agent, it must then also be admitted that the ratification was made under a misapprehension of their rights; for they certainly believed that they were obtaining, by the assignment to them of the mortgage of indemnity, an available security. And we” *20 cannot imply a ratification by a principal of the unauthorized and culpable conduct of his agent from acts done in ignorance or mistake of his rights.
We find, then—
1. That Lawrence was liable to Grant & Stone for gross negligence in the conduct of his agency.
2. That such liability was never discharged, by any ratification or adoption of his acts of negligence, by his principals.
This brings us to the second of the two principal questions in this case. Does this mortgage of indemnity inure, in equity, to the benefit of Grant & Stone, in preference to the claims of subsequent mortgagees ?
If Lawrence had never assigned his mortgage of indemnity to his principals, they could not, as complainants, come into a court of equity and subject the mortgaged premises to the payment of their claim against Clarkson, without having first fixed the liability of Lawrence, by judgment in a court of law. This seems to be settled — ■ and this is all that is settled — by the case of O. Life Ins. & Trust Co. v. Reeder et al., 18 Ohio Rep. 35.
Lawrence was intrusted by his principals with the duty of taking ample security in their behalf. By his gross negligence in failing to do so, he voluntarily assumed the relation of surety to those principals. The language of his conduct is this: “ My principals, Grant & Stone, are not willing to trust solely to the word and personal responsibility of Clarkson, and desire security; but I can, and I will, trust the word and personal responsibility of Clark-son, and if he do not pay them, I will.” Now, it is a familiar principle of equity jurisprudence, that “ where a surety, or person standing in the situation of a surety for the payment of a debt, receives a security for his indemnity, the principal creditor is, in equity, entitled to the full benefit of that security.” 9 Paige Rep. 435. It follows from this principle and the state of facts we have found, that, had there been no assignment of the mortgage of indem *21 nity from Lawrence to Grant & Stone, and had Grant & Stone fixed the liability of Lawrence by action and judgment at law, Grant & Stone might then come into a court of equity as complainants, and'make Lawrence’s mortgage of indemnity perfectly available to themselves. Now, by the assignment of his mortgage of indemnity to his principals, Lawrence, in effect, waives the fixing of his liability by action at law, and tacitly admits that liability. And are the rights and duties of parties to be changed or extinguished merely because they see proper to do, of their own free will and accord, the very things which equity would compel them to do if those rights and duties had been stubbornly contested ? It is the policy of the law to avoid circuity of action; and surely the equitable rights and duties of these parties can be in no way altered by virtue of this assignment.
if the admissions of Lawrence, however, were collusive in their character, or if they were made in mistake of his real rights and liabilities, we would give them no effect as against a subsequent incumbrancer. But we do not rest on his admissions a] one. We have, as we properly may do, looked at the evidence, and from the evidence we find, as matter of fact, the gross negligence which is the proper basis of his just liability.
The result and equitable effect of the arrangement by which Grant & Stone became the assignees of the indemnity mortgage, was, that Lawrence, on his part, acknowledged his pei’sonal liability for the amount Clarkson owed them unsecured; and Grant & Stone, on their part, agreed, in consideration of the assignment of the indemnity mortgage, to look to that mortgage instead of Lawrence for the amount of his acknowledged liability to them.
After that arrangement, Grant & Stone could not have brought an action at law and obtaixxed a judgment against Lawrence; for the acceptance of the assignment could have been pleaded in bar to the action, and a court of law will not render a judgment which cannot be enforced; but *22 a court of chancery, unlike a court of law, can, without enforcing against Lawrence the payment of that liability, ascertain its amount and treat Grant & Stone as the assignees of the amount of the liability of Clarkson to Lawrence, thus ascertained. (See Hayden v. Smith, 12 Metc. 511.) And hence, after the assignment under the circumstances stated, a court of chancery was the proper forum for Grant & Stone to enforce their rights in, as assignees of the indemnity mortgage.
That Lawrence, by his negligence in not taking such security as, by the terms of his instructions from his principals, he was bound to take, and by his positive malfeasance in giving up, without their knowledge, such security as he had taken, assumed the attitude and relation of a surety for Clarkson to Grant & Stone, and that he ought to be so taken and held, is, we think, clear. He had placed himself in such a position in respect to the other parties, that the rights, liabilities, and incidents attaching to the relation of principal and surety, might properly be claimed and enforced by the parties respectively. If, for example, Lawrence had paid to Grant & Stone the $25,000 due them from Clarkson, the liability of Clarkson to them would have been extinguished, and Lawrence, subrogated to their rights against Clarkson, could have maintained his action against him for that amount.
If we do not err in regarding Lawrence in the light of a surety for Clarkson, then the case of Hayden v. Smith, 12 Metc. 511, is entirely analogous to the case before us, and, in the view we have taken of this question, we are fully borne out by its authority.
In that case, Shaw was surety for Buck on a note of hand to Smith, and had taken from Buck a mortgage of indemnity. "While the note was still outstanding and unpaid, the surety, Shaw, assigned his mortgage of indemnity to Smith, the holder of the note, and at the same time took from him a “ release of all his liability, other than the use of his name in the collection of the note.” And the *23 court held, in. a proceeding in equity instituted by Hayden, a subsequent incumbrancer, that under these circumstances the indemnity mortgage inured to the benefit of Smith, and was the preferable lien on the mortgaged premises.
In that case, the release of the surety was express; in that before us, it is implied from the nature of the transaction between the parties. There the court held it to be them duty to do equity by giving effect to the manifest intention of the parties; and we feel ourselves impelled to a similar conclusion. Otherwise, it seems to us, we must “ stick in the bark,” and close our eyes to the substance of the transaction.
Finally, in the proceedings which we are called on to review, Grant & Stone do hot come into court as complainants, seeking to subject to their claim against Clarkson the premises covered by the mortgage of indemnity. But they are brought in as defendants to a bill filed by a subsequent moi’tgagee of the same premises, who seeks to divest them of all claim under the prior mortgage assigned to them. And it seems to us to be very material, that this aspect of the case before us should be specially noted.
There may be, as was decided in the case in 18 Ohio Rep. before cited, very good reasons why a creditor may not be permitted to come, as a complainant, into a court of equity and demand to be subrogated to the rights of a surety under a mortgage of indemnity, until he has first established by judgment his claim against the principal debtor; and yet those reasons have no just application to parties standing in an entirely different attitude. Grant & Stone do not come into court voluntarily invoking its action in their behalf. They are brought here at the summons of a subsequent incumbrancer, who seeks to deprive them of all benefit of the prior mortgage which they have obtained by assignment. In this condition of affairs, even supposing that Grant & Stone had not, in taking the assignment of the mortgage of indemnity, released their right to a personal action against Lawrence for his negli *24 gence, what ought a court of equity to do ? Ought it to stay proceedings until Grant & Stone could sue Lawrence, and recover a judgment at law against him? We can hardly think so. There is no case brought to our notice which would require it. But granting even this, still the court would be precluded from this course of procedure, by the fact that Grant & Stone, in accepting the indemnity mortgage, released Lawrence from personal responsibility. And we are at last reduced to the same alternative as that under which the court, in Hayden v. Smith, found itself placed — that of doing equity by carrying out and effectuating the intentions of parties, or of doing injustice by ignoring those intentions. Under these circumstances, we cannot hesitate to adopt the former alternative.
“A defendant to a suit in equity may set up claims purely legal, in his answer, provided they are connected with, or arise out of, the matter set up in the bill.” Hume v. Long, 6 Monr. 116.
“Courts of equity will make that party immediately liable who is ultimately liable at law.” Riddle v. Mandeville, 5 Cranch’s Rep. 822. Again: “ Courts of chancery have full power to decide all questions of law and fact which arise in that court, and the reference of such questions to courts of law, or to juries, is at the discretion of the court.” Hilleary v. Crow, 1 Har. & J. Rep. 542.
In Cathcart v. Robertson, 5 Peters’ Rep. 263, the rule is thus stated: “It is well settled that if the jurisdiction of a court of equity attaches, it will go on to do complete justice, though, in its progress, it may decree on a matter which was cognizable at law.” Kinshaw v. Thompson, 4 Johns. Ch. Rep. 609; Beardsly v. Halls, 1 Boot’s Rep. 366; and Chism v. Heale, 6 Munf. Rep. 63, affirm the same principle.
“"When the jurisdiction of a court of equity is established, and its duty to hear and determine is unquestioned, it looks only to the substance of transactions, and is never embarrassed by the forms or complications in which they *25 may be involved.” Hollister v. Dillon, 4 Ohio St. Rep. 207-8.
The parties, their allegations and proofs, their legal rights and equitable claims, are all before us. We can see no reason why any of them should be turned over to a court of law, or be precluded because they have not already gone there. "We are of opinion that, under the facts of the case as we find them to exist, the mortgage of indemnity from Clarkson to Lawrence, on its assignment by Lawrence to Grant & Stone, inures to the benefit of, and is, in equity, available to them; and that, therefore, theirs is the first and preferable lien on the premises covered by it, to the extent of Clarkson’s remaining indebtedness to Grant & Stone; that being the amount and limit of Lawrence’s liability.

Original decree reversed.

 Judge Bowen’s terra of office expired on the 9tb day of February, 1858, when be was succeeded by Judge Sutliff.